BENEFICIAL CORPORATION, a Delaware Corporation, and Beneficial Management Corporation, a Delaware Corporation, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 75–2102.

United States Court of Appeals, Third Circuit.

Argued June 8, 1976.

Decided Sept. 8, 1976.

As Amended Sept. 14, 1976.

E. Norman Veasey, R. Franklin Balotti, Richards, Layton & Finger, Wilmington, Del., for petitioners.

Robert J. Lewis, Gen. Counsel, Gerald P. Norton, Deputy Gen. Counsel, Gerald Harwood, Asst. Gen. Counsel, William A. E. Doying, Atty., Washington, D. C., for the Federal Trade Commission.

Before VAN DUSEN, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

We here consider a petition for review of a final order of the Federal Trade Commission, filed pursuant to 15 U.S.C. § 45(c). The order directed the petitioner Beneficial Corporation to cease and desist from certain practices in connection with its loan and tax preparation business.[1] Beneficial challenges both the Commission's violation determinations and the breadth of its remedy. We enforce the Commission's order in part, but vacate and remand in part because we conclude that the order is overbroad in one respect.

## I. THE COMMISSION PROCEEDINGS

On April 10, 1973, the Federal Trade Commission filed a complaint charging Beneficial with unfair and deceptive trade practices in connection with the preparation of income tax returns and the making of consumer loans in the loan offices of the Beneficial Finance System, in violation of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Beneficial, through 1400 branches operated by wholly-owned subsidiaries comprising the Beneficial Finance System, engaged in the business of making loans to members of the public based on their credit-worthiness. In the spring of 1969 Beneficial decided to go into the business of income tax return preparation. Because of developments in computer technology, Beneficial's loan officers were able to gather the information necessary for a computer to prepare tax returns accurately and at reasonable cost. The decision to enter the tax return preparation business was based on the belief that customers for the service who needed funds to pay the tax found to be due would find it convenient to borrow such funds from Beneficial. It soon became apparent, however, that most such customers would actually receive tax refunds. Beneficial decided to advertise a loan providing for an immediate use of money in anticipation of the tax refund, thus eliminating the wait for a refund check from the government. The Commission and Beneficial agreed that the tax refund loan is nothing other than Beneficial's usual loan service, based on the credit-worthiness of the borrower as to which the

---

1. The petitioners are Beneficial Corporation and Beneficial Management Corporation, both of which are corporations incorporated under the laws of Delaware with their principal places of business in Delaware and New Jersey, respectively. The loan offices in the Beneficial Finance System are operated by subsidiaries of Beneficial Corporation. Both of the petitioners will be referred to collectively as "Beneficial".

anticipated tax refund may have no bearing. The parties differed on (1) whether the advertising of the loan deceived customers as to its nature, and (2) whether Beneficial improperly used the tax information it obtained in its tax return preparation service to solicit customers for loans. After an evidentiary hearing an administrative law judge on October 21, 1974, found Beneficial to be in violation in both respects. The Commission affirmed this decision on July 15, 1975, and entered a cease and desist order which, among other things, prohibited Beneficial from using in its copyrighted advertising the term " 'instant tax refund,' or any other word or words of similar import or meaning," and from using customer tax information in loan solicitations except under prescribed conditions.

The evidence before the administrative law judge established that Beneficial's 1969 and early 1970 advertising typically used a text such as the following:

"Do you have a refund coming to you on your income taxes this year? Well, there's no need to wait weeks for your refund check. Get the money right now—even before you mail your return—with a cash advance from Beneficial. We call it the Instant Tax Refund, a special service of Beneficial Finance Instant Tax Refund. At Beneficial you're good for more. . . ."

By February 1970 Beneficial added a reference to a loan, and to the fact that the customer would have to qualify for that loan. There were additional modifications and qualifications with the result that Beneficial's radio and television advertisements at the time of the Commission's order typically were like the following:

"ANNCR: This year, have your taxes prepared a better way . . .
SINGERS: At Beneficial (toot, toot)
. . .
ANNCR: at Beneficial Finance. Beneficial's Income Tax Service does your taxes by computer . . . for as little as five dollars. And listen to Beneficial's 'Instant Tax Refund' Plan: if you have a refund coming, you don't have to wait weeks for a Government check. The instant you qualify for a loan, Beneficial will lend you the equivalent of your refund, in cash, instantly. It's the 'Instant Tax Refund' Plan . . . at Beneficial Finance. The place to have your taxes done this year."

The Commission concluded that both the original advertising and the modified copy were false and misleading, and that the proper remedy was a total prohibition against the use of the copyrighted terms "Instant Tax Refund Plan" or "Instant Tax Refund Loan", no matter how qualified by the preceding or following text.

The evidence before the administrative law judge also established that from late 1969, when it started its tax return preparation business, until December 1971, Beneficial routinely used information obtained from its tax return customers for the purposes of soliciting loans. Indeed, the generation of loan business was the principal motivation underlying the decision to expand into the tax return preparation business. On December 10, 1971, § 316 of the Revenue Act of 1971, 26 U.S.C. § 7216, was enacted, effective January 1, 1972. Subject to exceptions not material here, § 7216(a) provides

General rule.—Any person who is engaged in the business of preparing, or providing services in connection with the preparation of returns of the tax imposed by chapter 1, or declarations or amended declarations of estimated tax under section 6015, or any person who for compensation prepares any such return or declaration for any other person, and who—

(1) discloses any information furnished to him for, or in connection with, the preparation of any such return or declaration, or

(2) uses any such information for any purpose other than to prepare, or assist in preparing, any such return or declaration,

shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined

not more than $1,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution.

This statute establishes a general prohibition against the disclosure or use for non-tax purposes of tax information gathered by a tax preparer like Beneficial. Treasury regulations adopted in 1974 under the authority of § 7216(b)(3), however, permit[2] the use of such information with the customer's written consent.[3] The new law compelled Beneficial to alter its solicitation practices. In attempting to comply with the requirements, Beneficial adopted a Form BOR–56, reproduced in the margin in its entirety,[4] and required that its loan offi-

2. (a) Written consent to use or disclosure—(1) Solicitation of other business. (i) If a tax return preparer has obtained from the taxpayer a consent described in paragraph (b) of this section, he may use the tax return information of such taxpayer to solicit from the taxpayer any additional current business, in matters not related to the Internal Revenue Service, which the tax return preparer provid‾ ₎ and offers to the public. The request for such consent may not be made later than the time the taxpayer receives his completed tax return from the tax return preparer. If the request is not granted, no follow up request may be made. This authorization to use the tax return information of the taxpayer does not apply, however, for purposes of facilitating the solicitation of the taxpayer's use of any services or facilities furnished by a person other than the tax return preparer, unless such other person and the tax return preparer are members of the same affiliated group within the meaning of section 1504. Thus, for example, the authorization would not apply if the other person is a corporation which is not affiliated with the tax return preparer within the meaning of section 1504(a). Moreover, this authorization does not apply for purposes of facilitating the solicitation of additional business to be furnished at some indefinite time in the future, as, for example, the future sale of mutual fund shares or life insurance, or the furnishing of future credit card services. It is not necessary, however, that the additional business be furnished in the same locality in which the tax return information is furnished.

Treas.Reg. § 301.7216–3(a) (1974).

3. The form of consent is specified and illustrated in Treas.Reg. § 301.7216–3(b)–(c) (1974):

(b) Form of consent. A separate written consent, signed by the taxpayer or his duly authorized agent or fiduciary, must be obtained for each separate use or disclosure authorized in paragraph (a)(1), (2) or (3) of this section and shall contain—

(1) The name of the tax return preparer,

(2) The name of the taxpayer,

(3) The purpose for which the consent is being furnished,

(4) The dates on which such consent is signed,

(5) A statement that the tax return information may not be disclosed or used by the tax return preparer for any purpose (not otherwise permitted under § 301.7216–2) other than that stated in the consent, and

(6) A statement by the taxpayer, or his agent or fiduciary, that he consents to the disclosure or use of such information for the purpose described in subparagraph (3) of this paragraph.

(c) Illustrations. The application of this section may be illustrated by the following examples:

Example (1). In order to stimulate the making of loans, a bank advertises that it is in the business of preparing tax returns. A taxpayer goes to the bank to have his tax return prepared. After the return has been completed by the bank, the employee of the bank who obtained the tax return information from the taxpayer explains that the taxpayer owes an additional $400 in taxes and that the bank's loan department may be able to offer the taxpayer a loan to pay the tax due. If the taxpayer decides to accept the opportunity offered to apply for a loan, the bank must first have the taxpayer execute a written consent described in paragraph (b) of this section for the bank to use any of such information which is required in determining whether to make the tax loan.

4. AUTHORIZATION

To _____

I hereby authorize and request you to use my name and address for the purpose of soliciting me in connection with any business in which you or your associated companies or affiliated corporations may engage. Furthermore, I acknowledge that this and any other information which may appear in any loan or finance application by me or on my behalf or in any loan or finance statement or information form, given in connection therewith, was not given to you for the purpose of preparing any tax return on my behalf.

Dated: _____

_____
Signature

_____
Name (Print)

_____
Address

_____
City State Zip

cers first procure a tax return customer's signature on that form before soliciting the customer for a loan. The Commission held that the pre-1972 use of tax information for loan solicitations was an unfair and deceptive trade practice amounting to an abuse of a confidential relationship, in violation of § 5. It also held that Form BOR–56 was inadequate as an informed consent. Without deciding whether Beneficial's present practices violated the Revenue Act of 1971, the Commission held that those practices continued to violate § 5 and entered an order prohibiting Beneficial from:

"7. Using information concerning any customers of respondents, including the name and/or address of the customer, for any purpose which is not essential or necessary to the preparation of a tax return if such information was obtained by respondents as a result of the preparation of the customer's tax return which includes any information given by the customer after he has indicated, in any way, that he is interested in utilizing respondents' tax preparation services, unless prior to obtaining such information respondents have both (1) specifically requested from the customer the right to use the tax return information of the customer and (2) have executed a separate written consent signed by the customer which shall contain:

1. Respondent's name

2. The name of the customer

3. The specific purpose for which the consent is being signed

4. The exact information which will be used

5. The particular use which will be made of such information

6. The parties or entities to whom the information will be made available

7. The date on which such consent is signed

8. A statement that the tax return information may not be used by the tax return preparer for any purpose other than that stated in the consent, and

9. A statement by the taxpayer that he consents to the use of such information for the specific purpose described in subparagraph (3) of this paragraph;

Provided, however, that nothing herein shall prohibit respondents from using names and addresses only of customers for the purpose of communication with such customers solely concerning respondents' income tax preparation business.

Nothing in the above provision is intended to relieve respondents of any further requirements imposed on them by the Revenue Act of 1971, Pub.L. 92–178, title III, § 316(a), December 10, 1971; 26 U.S.C. § 7216 or regulations issued pursuant to it."

The instant petition for review followed the Commission's decision and order.

## II. DECEPTIVE ADVERTISING

### A.

■■ At the outset, Beneficial contends that the Commission's finding that its "Instant Tax Refund" advertising campaigns were deceptive lacks evidentiary support, and that in the absence of such a finding, supported by record evidence, no order could properly have been entered respecting its advertising. Section 5(c) of the Act, 15 U.S.C. § 45(c), provides that "[t]he findings of the Commission as to the facts, if supported by evidence, shall be conclusive" upon review in the Court of Appeals. The law is clear that properly interpreted, the statute requires review by the substantial evidence in the record as a whole standard.[5]

---

5. See, e. g., Adolph Coors Co. v. FTC, 497 F.2d 1178, 1184 (10th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975); American Cyanamid Co. v. FTC, 363 F.2d 757, 772 (6th Cir. 1966); Continental Wax Corp. v. FTC, 330 F.2d 475, 477 (2d Cir. 1964); Regina Corp. v. FTC, 322 F.2d 765, 768 (3d Cir. 1963); Snap-On Tools Corp. v. FTC, 321 F.2d 825, 835 (7th Cir. 1963); Carter Products, Inc. v. FTC, 268 F.2d 461, 493 (9th Cir.), cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959). See also FTC v. Colgate-Palmolive Co., 380 U.S. 374, 386 n. 14, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1968) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

The parties agree that the tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context.[6] An intent to deceive is not an element of a deceptive advertising charge under § 5.[7] Moreover, the FTC has been sustained in finding that advertising is misleading even absent evidence of that actual effect on customers; the likelihood or propensity of deception is the criterion by which advertising is measured.[8] Whether particular advertising has a tendency to deceive or mislead is obviously an impressionistic determination more closely akin to a finding of fact than to a conclusion of law. Cf. FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385, 80 S.Ct. 155 (1965). At the same time, evidence that some customers actually misunderstood the thrust of the message is significant support for the finding of a tendency to mislead.

 The initial advertising quoted above (1969-early 1970) did not indicate, at least in words, that the offered "advance" was actually a loan, that the customer would have to meet regular standards of credit-worthiness, or that if the customer had a satisfactory credit rating he could obtain a Beneficial loan even though he was not a tax return preparation customer. Beneficial's own advertising agency reported that the initial campaign resulted in fairly widespread public confusion as to the nature of the "refund" being offered. The Commission concluded:

"The early Instant Tax Refund advertising is, on its face, totally misleading about the true nature of Beneficial's offer. Instead of making clear that Beneficial is simply offering its everyday loan service, the advertising implies that Beneficial will give a special cash advance to income tax preparation customers with a government refund due, in the amount of their refund. The natural impression, since the Instant Tax Refund is stressed as exclusive and special is that this cash advance is different from a normal consumer loan."

This finding is supported by substantial evidence. While not conceding the validity of the Commission's finding with respect to the initial advertising, Beneficial does not seriously dispute that we must accept it. It contends, however, that because the early text was soon abandoned with no prompting from the Commission, the finding cannot support a cease and desist order. But this and other courts have held that at least where a discontinued deceptive trade practice could be resumed, the prior practice may be the subject of a cease and desist order.[9] Here the Commission's complaint was not filed until three years after the early advertising was discontinued, and there is no evidence from which the Commission could infer that it would in the early form be repeated. Beneficial urges that the entry of a cease and desist order in such circumstances, based solely on the early violations, would amount to an abuse of discretion.[10]

6. See e. g., FTC v. Sterling Drug, Inc., 317 F.2d 669, 674 (2d Cir. 1963); Aronberg v. FTC, 132 F.2d 165, 167 (7th Cir. 1943).

7. Regina Corp. v. FTC, 322 F.2d 765, 768 (3d Cir. 1963).

8. Bankers Security Corp. v. FTC, 297 F.2d 403, 405 (3d Cir. 1961); Resort Car Rental Sys. v. FTC, 518 F.2d 962, 964 (9th Cir. 1974) (per curiam); Montgomery Ward & Co. v. FTC, 379 F.2d 666 (7th Cir. 1967); Feil v. FTC, 285 F.2d 879, 896 (9th Cir. 1960).

9. Hershey Chocolate Corp. v. FTC, 121 F.2d 968, 971-72 (3d Cir. 1941); P. F. Collier & Son

Corp. v. FTC, 427 F.2d 261, 271-72 (6th Cir.), cert. denied, 400 U.S. 926, 91 S.Ct. 188, 27 L.Ed.2d 186 (1970); Feil v. FTC, 285 F.2d 879, 886 n.15 (9th Cir. 1960).

10. See Rodale Press, Inc. v. FTC, 132 U.S.App. D.C. 317, 407 F.2d 1252 (D.C. Cir. 1968); FTC v. Civil Service Training Bureau, 79 F.2d 113 (6th Cir. 1935); John C. Winston Co. v. FTC, 3 F.2d 961 (3d Cir.), cert. denied, 269 U.S. 555, 46 S.Ct. 19, 70 L.Ed. 409 (1925). But see C. Howard Hunt Pen Co. v. FTC, 197 F.2d 273, 281 (3d Cir. 1952).

■ We need not decide that issue in this case, however, for we conclude that the Commission's finding that even the later advertising had a tendency to deceive or mislead has a sufficient evidentiary support in the record as a whole. The testimony of some consumers, credited by the Commission, was that during the later period they failed to understand that Beneficial was offering only its normal loan service with normal finance charges. Their impression was that the main qualification for the Instant Tax Refund loan was entitlement to an actual government refund. These consumers may well have been singularly dense.[11] They were, nevertheless, a part of the audience to which the advertisements were directed. We cannot second guess the Commission's finding respecting the later advertising. *FTC v. Colgate-Palmolive Co., supra; Fedders Corp. v. FTC,* 529 F.2d 1398, 1403 (2d Cir. 1976), *petition for cert. filed,* 44 U.S.L.W. 3652 (U.S.Apr. 19, 1976). Thus whether or not the Commission could have acted solely on the basis of the earlier advertising, it certainly did not abuse its discretion in concluding that some remedy was still appropriate since the confusion persisted.

### B.

■ Both the administrative law judge and the Commission concluded that the *only* appropriate remedy for the violation found was a total ban on the use of the Instant Tax Refund phrase or any words of similar import. Beneficial contends that explanatory words could cure any tendency to mislead, and that an order forcing it to abandon entirely its copyrighted and heavily promoted phrase is unwarranted. The Commission reasoned:

"No brief language is equal to the task of explaining the Instant Tax Refund slogan, for the phrase is inherently contradictory to the truth of Beneficial's offer. In truth, the Instant Tax Refund is not a refund at all, but only Beneficial's everyday loan service . . . ; nor is it in the least related to any tax refunds, for the size of the loan Beneficial wishes to sell is geared to the customer's credit limit instead of his government refund and many people due a government refund do not qualify for an Instant Tax Refund loan at all . . . ."

We do not believe that the Commission's conclusion as to the capacity of qualifying language to apprise Beneficial's audience of the true nature of the offered service can be sustained. We acknowledge, of course, that we are ordinarily obliged to defer broadly to the Commission's exercise of informed discretion in framing remedial orders that bear some rational relationship to the removal or prevention of an established violation. *See FTC v. National Lead Co.,* 352 U.S. 429, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); *FTC v. Colgate-Palmolive Co., supra; Windsor Distributing Co. v. FTC,* 437 F.2d 443, 444 (3d Cir. 1971) (per curiam); *Consumer Products of America, Inc. v. FTC,* 400 F.2d 930, 933 (3d Cir. 1968). But we are dealing in this case with the government regulation of a form of speech. The first amendment requires, we believe, an

11. "The general public has been defined as 'that vast multitude which includes the ignorant, and unthinking and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions.' The average purchaser has been variously characterized as not 'straight thinking,' subject to 'impressions,' uneducated, and grossly misinformed; he is influenced by prejudice and superstition; and he wishfully believes in miracles, allegedly the result of progress in science . . . . The language of the ordinary purchaser is casual and unaffected. He is not an 'expert in grammatical construction' or an 'educated analytical reader' and, therefore, he does not normally subject every word in the advertisement to careful study."

1 Callman, Unfair Competition and Trademarks § 19.2(a)(1), at 341–44 (1950) quoted in *FTC v. Sterling Drug, Inc.,* 317 F.2d 669, 674 (2d Cir. 1963).

examination of the Commission's action that is more searching than in other contexts.

 It is now established beyond dispute that there is no commercial speech exception to the first amendment. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *see also Young v. American Mini Theatres, Inc.,* —— U.S. ——, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). That does not mean that an advertiser may engage in speech that is an essential part of a scheme to violate an otherwise valid law. *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 388, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). It does mean that the remedy for the perceived violation can go no further in imposing a prior restraint on protected commercial speech than is reasonably necessary to accomplish the remedial objective of preventing the violation. *See, e. g., United States v. O'Brien,* 391 U.S. 367, 382, 88 S.Ct. 1673, 20 L.Ed.2d 692 (1968); *New Jersey State Lottery Commission v. United States,* 491 F.2d 219 (3d Cir. 1974) (en banc), *vacated as moot,* 417 U.S. 907, 94 S.Ct. 2603, 41 L.Ed.2d 211 (1975); *Veterans & Reservists For Peace in Vietnam v. Regional Commissioner of Customs,* 459 F.2d 676 (3d Cir.), *cert. denied,* 409 U.S. 933, 93 S.Ct. 232, 34 L.Ed.2d 188 (1972); *Linmark Associates, Inc. v. Township of Willingboro,* 535 F.2d 786, at 813–814 (3d Cir. 1976) (Gibbons, J., dissenting).

Even before the demise of *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), was heralded in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra,* and *Bigelow v. Virginia, supra,* the Supreme Court held that the Federal Trade Commission abused its discretion in ordering the excision from advertising of a valuable business asset like a trade name without considering whether modification of the

message could eliminate the objectionable portion. *Jacob Siegal Co. v. FTC,* 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888 (1946); *FTC v. Royal Milling Co.,* 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706 (1933). The Second Circuit has said that where qualifying explanatory language does not inherently contradict the advertiser's identifying language it should be accepted in preference to requiring excision. *Elliott Knitwear, Inc. v. FTC,* 266 F.2d 787, 790 (2d Cir. 1959). The Commission attempts to distinguish these authorities on the ground that no combination of words in which "instant" and "refund" appear in a proximate relationship can avoid conveying the impression that Beneficial is offering an instant tax refund from the government rather than an instant loan. We do not believe that the following examples convey that impermissible impression:

> "Beneficial's everyday loan service can provide to regularly qualified borrowers an Instant Tax Refund Anticipation Loan whether or not the borrower uses our tax service."

or

> "Beneficial's everyday loan service can provide to any regularly qualified borrower an instant loan in anticipation of his tax refund. We call it an Instant Tax Refund Anticipation Loan."

In failing to consider fully the feasibility of requiring merely that advertising copy be rewritten in lieu of total excision of the offending language, the Commission would appear to have exceeded its remedial authority under § 5 as shaped by the *Jacob Siegel-Royal Milling* line of cases. The Commission's opinion dealt with the *Royal Milling* case in a footnote:

> "Though we believe the *Royal Milling* line of cases is compatible with our normal responsibility to enter effective but not overbroad orders, to the extent it may actually be a limitation or exception to the Commission's authority to devise fully effective remedies, then we decline to expand the exception from trade names to advertising slogans."

We reject the limiting construction that the Commission attaches to *Royal Milling*. This conclusion is based in part upon the difficulty we have in accepting the Commission's differentiation between trade names and copyrighted advertising material—a distinction without a difference in the spirit of *Royal Milling*. The conclusion is reached not unmindful of the long shadow cast by the first amendment, however, for doubtless the Commission's broad construction of its § 5 remedial authority cannot survive the demise of the commercial speech exception to the first amendment. While *Royal Milling* in terms merely describes a statutory limitation upon the Commission's remedial power in a particular class of cases, the rule it announced has subsequently evolved into a general statement of constitutional principle.

■ The Commission, like any governmental agency, must start from the premise that any prior restraint is suspect, and that a remedy, even for deceptive advertising, can go no further than is necessary for the elimination of the deception. The Commission's order proscribing use of the term *instant tax refund* or *any other word or words of similar import or meaning*, without consideration of the context in which the words appear, went further than was permitted for that purpose and was an abuse of the Commission's remedial discretion. It cannot in that form and without such consideration be affirmed or enforced.

## III. THE TAX INFORMATION USE VIOLATION

In its complaint the Commission charged that the retention and use of the customer tax information violated § 5 in two respects. First, it charged that the special relationship between a tax return preparer and a customer had the capacity and tendency to mislead the customer into the erroneous and mistaken belief that the information provided would be used solely for the preparation of the tax return and would

remain confidential. Thus the failure to disclose anticipated use in loan solicitation was said to be a false, misleading and deceptive practice injuring the customers. Secondly, the Commission charged that because Beneficial had competitors in the tax return preparation business, from whom business could be diverted, the failure to disclose anticipated use of the tax information in loan solicitations was an unfair method of competition.

■ Beneficial does not contend that the use of the tax information in loan solicitation, absent § 316 of the Revenue Act of 1971, is a subject matter beyond the reach of the Commission's § 5 authority. Rather, it contends that the latter statute and the Treasury Regulations issued thereunder preempt the field, that it is now in full compliance with those regulations, and that the Commission's order requiring more is invalid. While admitting that § 5 originally gave the Commission authority to find unfair trade practices in relation to tax preparation services, Beneficial argues that § 316 was intended by Congress to circumscribe that power. Nothing on the face of § 316 supports that construction, and we have been referred to no legislative history which would tend to suggest such an intention.[12] The criminal prohibition in § 316 appears to be directed at preserving the confidentiality of tax return information except under specified circumstances. Enforcement under § 5 of the Federal Trade Commission Act, in contrast, is aimed at preventing unfair and deceptive acts and practices. There is nothing inconsistent between the two policies, and there is no reason for attributing to Congress the intention of reducing the Commission's power to prevent deception or unfairness. If the Commission had directed conduct which is inconsistent with the confidentiality policy of § 316, we could understand Beneficial's objection. But in this case the Commission is pursuing a separate governmental objective in a manner wholly consistent with that policy.

---

**12.** The House, Senate and House Conference Reports on the Revenue Act of 1971 are reproduced in 1971 U.S.Code Cong. & Admin.News pp. 1825–2079. There does not appear to be any discussion of § 316 in any of these reports.

That the Commission's order goes beyond the requirements of Treasury Regulation 301.7216–3 in several insignificant respects seems to us unexceptionable. Nor does Beneficial's contention [13] that the Internal Revenue Service has approved its Form BOR–56 change our view. Assuming such approval, nothing in the Revenue Act of 1971 or any other statute confers on the Internal Revenue Service authority to determine what is an appropriate remedy for a violation of § 5 of the Federal Trade Commission Act.

 The Commission's finding that Beneficial's practices, both prior to the enactment of § 316 and thereafter, were misleading because of the failure of Form BOR–56 to adequately disclose the nature and purpose of the waiver of confidentiality is supported by substantial evidence in the record as a whole. The remedial order, which permits Beneficial to solicit tax return customers for loan business, only requires the observance of certain procedural formalities. Items (1), (2), (3), (7), (8) and (9) duplicate the six requirements of the Treasury Regulation. The additional items required to be disclosed are:

 4. The exact information which will be used.

 5. The particular use which will be made of such information.

 6. The parties or entities to whom the information will be made available.

These additional requirements are rationally related to the unfair practices which the Commission found. We cannot in these circumstances hold that the Commission abused its discretion in fashioning the remedy it did.

## IV. CONCLUSION

The petition for review will be granted insofar as the Commission's order requires total excision of the words "Instant Tax Refunds" from all Beneficial advertising. That part of the order will be set aside and the case remanded to the Commission for further proceedings consistent with Part IIB of this opinion. In all other respects the petition for review will be denied. To the extent that the petition has been denied, the order of the Commission is affirmed and the petitioners are commanded to obey it.

VAN DUSEN, Circuit Judge, dissenting and concurring in part:

I respectfully dissent from part II-B of the majority opinion,[1] which states that the Commission did not consider whether modification of the message advertised could eliminate the objectionable, deceptive portion of such message. The majority opinion overlooks this language of the Commission's opinion (part II-C):

"The law judge's order bans the use of the Instant Tax Refund phrase or similar words. He found no qualifying language could remedy the deception and that only purging Beneficial's advertisements of the phrase would suffice. Beneficial vigorously contends that explanatory language could cure any fault and that

---

**13.** That contention is disputed by the Commission as unsupported by the evidence. We need not resolve the dispute.

**1.** The majority apparently does not challenge the following findings of the Commission, which are supported by substantial evidence on the whole record (1193a):

"In truth, it is admitted, what Beneficial is offering is its everyday loan service. The Instant Tax Refund is not a refund at all but a personal consumer loan, with regular finance charges, costs, and repayment period. . . . Such a loan is always available to anyone meeting Beneficial's credit standards, whether or not the customer is owed a tax refund by the government, but Beneficial will not make any loan to a person failing to meet its credit standards, even if the customer is due a government refund. The size of the loan Beneficial wishes to sell is not related to any tax refund, but to the customer's credit limit." [References to record omitted.]

The testimony of more than five consumers, credited by the Commission, was that they were misled during the later period and "failed to understand that Beneficial was offering only its normal loan service with normal finance charges" (majority opinion at 618). As stated by the majority, "[t]heir impression was that the main qualification for the Instant Tax Refund loan was entitlement to an actual government refund."

forced abandonment of its copyrighted and heavily promoted phrase is unwarranted.

"In some instances, it is true, respondents have been allowed to retain trade names which had become valuable business assets, because the misleading qualities of the names could be dispelled by explanation. . . . If explanatory language is insufficient to qualify a deceptive trade name or is inherently contradictory, its effect is simply to confuse the public and the Commission in framing a proper remedy must excise the offending phrase altogether. [Citations omitted.] Moreover, the Commission has wide latitude in judgment, particularly in determining whether qualifying words will eliminate a deceptive trade name. . .

"In light of these principles, we see no reason for allowing Beneficial to retain the offending slogan. The Instant Tax Refund advertisements, we have held, have the capacity and tendency to mislead and have in fact misled consumers. In fact, since its inception in 1969, the Instant Tax Refund phrase has deceived continuously, and Beneficial's repeated efforts to explain it have not cured the false impression it leaves. Beneficial's inability to remedy the deception, which persists even in the qualifying phrase it offers on this appeal as a settlement, confirms what we believe to be obvious. No brief language is equal to the task of explaining the Instant Tax Refund slogan, for the phrase is inherently contradictory to the truth of Beneficial's offer. In truth, the Instant Tax Refund is not a refund at all, but only Beneficial's everyday loan service, complete with normal finance charges and credit checks; nor is it in the least related to any tax refunds, for the size of the loan Beneficial wishes to sell is geared to the customer's credit limit instead of his government refund and many people due a government refund do not qualify for an Instant Tax Refund loan at all; moreover, depending on the season of the year or the customer's sales resistance, the Instant Tax Refund may be called a Vacation loan, a Taxpayer loan, or a Bill Consolidation loan.

. . . . .

"Beneficial argues that excision of the Instant Tax Refund slogan and words of similar import would prevent any reference to the concept of tax refund loans. This is quite true. The record is absolutely clear that, in Beneficial's business at least, no such concept exists. If, however, Beneficial should begin offering a special loan service actually related in some way to income tax refunds, it may seek to reopen the order. For now we believe the absolute prohibition necessary."

[Footnotes omitted.] (1198a–1290a)

I do not believe that the advertisements suggested at page 619 of the majority opinion would make it clear to these consumers that the loan being offered is an everyday consumer loan having no relationship to tax refunds and no special features. Furthermore, on this record I believe the Commission was entitled to conclude that the words "tax refund loan" inherently contradict the idea of an everyday loan unrelated to refunds. The words "tax refund" imply something free and "unique" and the word "Anticipation" in the court-suggested advertisements might only underline the non-existent relationship between the loan and any refund. It is noted that the Commission gave Beneficial the right to reopen its order if a relationship between tax refunds and the loans was shown to exist in future advertisements (see above, this page).

Given the Commission's consideration of the possibility of a lesser remedy, its broad discretion, and Beneficial's inability to produce an advertisement which was not misleading, I believe the excision order should be sustained. See *Baker's Franchise Corp. v. FTC*, 302 F.2d 258, 262 (3d Cir. 1962), where this court said: "The matter of the choice of remedy is one for the Commission." See also cases cited at the top of page 618 of the majority opinion. At the

least, I believe the Commission in the first instance should be permitted to consider any new advertisements using the Instant Tax Refund language before they are used.

I would affirm the conclusion reached in part II-C of the Commission's opinion in view of these legal principles adopted by the Supreme Court of the United States:

A. THE COMMISSION MAY PROHIBIT STATEMENTS WHICH, THOUGH LITERALLY TRUE, ARE POTENTIALLY DECEPTIVE.

Although it is now clear that commercial speech enjoys "some" First Amendment protection, the Supreme Court has been careful to state that "regulatory commissions may prohibit businessmen from making statements which, though literally true, are potentially deceptive." *Young v. American Mini Theatres, Inc.,* —— U.S. ——, 96 S.Ct. 2440, 2451, 48 L.Ed.2d 310, and n. 31 (1976); see *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770–773, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 and n. 24 (1976), where the Court said: "The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flows cleanly as well as freely."

In *Young v. American Mini Theatres, Inc., supra* at ——, 96 S.Ct. at 2451 n. 31, the Court stated: "The power of the Federal Trade Commission to restrain misleading, as well as false, statements in labels and advertisements has long been recognized [citing cases]."

B. THE FEDERAL COURTS ARE LIMITED IN THEIR RIGHT TO REVIEW THE EXERCISE BY AN ADMINISTRATIVE AGENCY OF ITS DISCRETION.

In *Jacob Siegel Co. v. Federal Trade Commission,* 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888 (1946), the Court repeatedly emphasized the "limited" scope of our review of Commission discretion. In *Seigel,* the record did not indicate whether a remedy short of excision had been considered or would be adequate. The Court declined to hold that excision was inappropriate and simply remanded for consideration of a more limited remedy. See also *Federal Trade Commission v. Algoma Lumber Co.,* 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655 (1934) (upholding an excision order).

Here the Commission has considered and rejected a more limited remedy, and the *Siegel* case states at page 613, 66 S.Ct. at page 760, that: "The courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found."

Applying the standard enunciated in *Jacob Siegel,* which appears to survive the demise of the former commercial speech doctrine, I believe the choice of the remedy of total excision was permissible on this record.

In all other respects, I concur in the majority opinion.