[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 01-14137

_____

D. C. Docket No. 98-07058-CV-KLR

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**January 24, 2003**
**THOMAS K. KAHN**
**CLERK**

FEDERAL TRADE COMMISSION,

Plaintiff-Appellant,

versus

STEPHEN I. TASHMAN, individually,
and as an officer or manager of
the corporate defendant,
STEPHEN M. MISHKIN, individually,
and as an officer or manager of
the corporate defendant,
ERNEST F. LOCKAMY, individually,
and as an officer or manager of
the corporate defendant,
MICHAEL S. DUNDEE, individually,
and as an officer or manager of
the corporate defendant,
HARRIS M. COHEN, individually,
and as an officer or manager of
the corporate defendant,
TELECARD DISPENSING CORP.,
a Florida corporation,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Florida

————————————————

**(January 24, 2003)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and VINSON\*, District Judge.

TJOFLAT, Circuit Judge:

The investing public is concerned with two factors when confronted with a business opportunity: risk and reward. This point was underscored in a recent case in this Court. See Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., 310 F.3d 1321(11th Cir. 2002). There, we held that the defendant made misleading statements when it spoke of "unlimited profit potential" and ways to "limit risk" while, in fact, 95% of the firm's customers lost money on its proposed investments. The representations created a picture of the risk-to-reward ratio that, when compared to reality, was heavily distorted.

The focus in that case was on the *risk* variable. In this case, we turn to the other variable: *reward*. The Federal Trade Commission ("FTC") contends that the defendants misrepresented the potential profit that customers could expect to earn from their telephone card dispensing machines, thereby violating section 5 of the

————————————————————————
\*Honorable Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, in addition to the

FTC's Franchise Rules, 16 C.F.R. §§ 436.1 *et seq*. After a six-day bench trial, the

district court entered judgment in favor of the defendants. We reverse and render

judgment in favor of the FTC.

## I.

Stephen Tashman was in the business of selling "business opportunities" to

hopeful entrepreneurs. Tashman sold machines that dispensed phone cards[1] (and

the phone cards that go in them) through the corporation that he controlled,

Telecard Dispensing Corp. ("TDC").[2] The record points to an intricate web of

sales pitches by the defendants that ultimately consisted of untruthful, baseless

assertions. First, TDC attempted to lure customers through radio advertisements

which asked listeners the following question: "Do you really want to make more

money – an additional twenty-five to thirty-five thousand dollars a year or more,

possibly a lot more, and only work three to five hours per week?" The

advertisement went on to proclaim that "[w]ith a very small investment you can

make $600 to $700 a week or more – maybe a lot more – working as little as five

hours a week." The advertisement concluded: "Stop the excuses. You can do it.

---

[1] In order to get the attention of passersby, the machines would "speak" the following message: "Hi there! Get your long distance phone card and call anywhere, anytime, from any touchtone phone without a penny in your pocket and save up to 50%. Buy it here, buy it now."

[2] Tashman and his corporation, TDC, are hereinafter called "the defendants."

3

You can change your life."

Spurred by the specter of "a lot more" than $140 per hour and the admonishment to "stop excuses," who could resist the temptation to call TDC? Upon making the phone call, prospective customers spoke to a telemarketer, known as a "fronter," who would read a script in which mathematical figures were thrown around in an effort to "get down to the nuts and bolts and talk about the money being made in this industry." This conversation included claims that (1) TDC's "locators" would put machines in public places experiencing a traffic flow of at least 500 persons per day; (2) 2% of passersby, according to TDC's "experience," are likely to purchase phone cards from the machines; and (3) entrepreneurs could be "expected" to pay off their machines[3] in about six months. Prospective customers were then sent "disclosure statements" which reinforced the rosy picture painted by the defendants. The disclosures stated, for example, that TDC received 287 positive letters and only 20 negative ones. TDC also encouraged prospective customers to speak to "references" who would give first-hand testimony of the profit potential in the phone card dispensing business.

Unfortunately for TDC's customers, TDC had no basis for many of its claims. The claim that customers could "expect" to pay off their machines in six

---

[3]Each vending machine had a cost of approximately $5,500; customers were encouraged to purchase two machines.

months, for example, was in turn based upon two untrue claims: that (1) 500 people per day would pass by the machines and (2) 2% of passersby would purchase cards. In fact, neither claim is true. TDC's "locators" were paid to put machines in any location, and many locations did not have foot traffic at a rate of 500 per day. Moreover, the 2% figure was completely made up. The record shows that the defendants once ran an experiment which, to the defendants' chagrin, showed that the machine made no sales whatsoever. The defendants then decided to borrow the usage rate from an unrelated business – vending machines in which people can attempt to catch stuffed animals with a mechanical crane. Compounding this misrepresentation, the radio advertisement, in conjunction with the disclosure statements and the telemarketers' emphasis on the "nuts and bolts of the money being made in the industry," created an impression that most customers were reaping nice profits and, on the whole, very satisfied. The record points to a quite different conclusion: few of the customers who bought machines made significant returns and most did not even recoup their original investment. The FTC put forward fourteen witnesses who claimed to have lost substantial sums in reliance on TDC's representations.[4] TDC, on the other hand, used four witnesses – only one of which was a customer who claimed to have made a profit, and his

---

[4]The FTC proffered many more witnesses, but the district court instructed the FTC that additional witnesses would be unnecessary.

testimony on this point is somewhat suspect.[5] Moreover, some of the "references" never owned phone card vending machines, and all of them were paid to serve as references. Finally, the disclosure statements failed to report that TDC received twenty to thirty calls per day complaining about sluggish phone card sales – hardly the portrait of customer satisfaction and profitability painted by TDC.

## II.

To establish liability under Section 5 of the FTCA, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material. FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1029 (7th Cir. 1988); FTC v. Atlantex Assocs., 1987-2 Trade Cas. (CCH) ¶ 67,788 at 59,252 (S.D. Fla. 1987), aff'd, 872 F.2d 966 (11th Cir. 1989). The defendants concede that the first and third elements have been established; they dispute only the second element. The undisputed evidence shows, however, that TDC had no basis for the representations it made. How, for example, could it claim that 2% of passersby would purchase phone cards when the only data TDC utilized was based upon an entirely different product? One searches in vain for the district court's analysis on whether particular assertions were likely to mislead. In its findings of

---

[5]Half of the witness's machines were purchased from other sources. These machines had four times the capacity of the machines purchased from the defendant.

fact and conclusions of law, for example, the court jumped from a correct recitation of the legal standard to a discussion of irrelevant points such as the fact that the business was "new" and the fact that "migrant workers" might buy the cards,[6] leading the court to conclude that "[i]t was therefore up to the potential customers to weigh the risks and profit potential, and to follow up their investment with the hard work and business savvy necessary to make the venture successful and profitable."[7]  With regard to the second point, no one doubts the utility of phone cards or claims that the product is a scam; all that is at issue are the statements made by the defendants.  As for the first point, there is no "new business" immunity from the Federal Trade Commission Act.  See, e.g., FTC v. Wolf, 1997-1 Trade Cas. (CCH) ¶ 71,713 (S.D. Fla. 1996), aff'd, 113 F.3d 1251 (11th Cir. 1997) (holding that defendants had violated section 5 by making false representations regarding earnings that consumers could expect from hot pizza vending machine business opportunities).   Indeed, it is precisely in the context of a new venture that investors are unlikely to have their own data.  In the "new

---

[6]At oral argument before the district court, the court similarly expounded upon the virtues of phone cards, drawing an analogy to the high risk/high reward environment of cellular phone technology a decade ago.

[7]Perhaps reflecting its *caveat emptor* sentiment, the district court stated: "If a deal sounds too good to be true, it probably isn't true.  But that is not necessarily a fraud.  [The] FTC cannot protect everyone from their own lack of walking around common sense."  And again: "[T]he government cannot be a big brother and just interfere in every relationship and restore things back to where they started.  People have to be responsible for walking around common sense."

7

business" setting, investors are the most vulnerable to the representations and purported "expertise" of those in the business of selling novel business opportunities. Finally, *caveat emptor* is simply not the law, and the district court's conclusion to the contrary is incorrect.

The district court even seemed to concede that misrepresentations were made. In its findings of fact and conclusions of law, it held that "reasonable potential customers would not have believed that they could make tens of thousands of dollars while working only three to four hours per week." The FTCA does not have an "extravagant claim" defense.[8] Moreover, this was only one of many misrepresentations made by TDC.

In short, the record contains overwhelming evidence that misrepresentations were made and that reasonable consumers were likely to (and, in fact, did) rely on those statements. Rather than analyzing those statements, the court focused on a few satisfied customers, the utility of the product being sold, and why the government ought not protect consumers from what it perceived as a lack of "hard work" and "walking around common sense." The district court's legal conclusions are incorrect, and its findings of fact are clearly erroneous.

---

[8]The defendant does not argue that reliance upon the representations were "unreasonable"; rather, it claims that reliance upon them was entirely reasonable precisely because the statements were truthful.

## III.

Count five of the FTC's complaint alleges that the defendants violated the FTC's Franchise Rule.[9] Section 436.1(b) of the Rule, 16 C.F.R. § 436.1(b)(2), states that if a franchisor makes any representation to a prospective franchisee regarding "a specific level of potential sales, income, gross or net profit for that prospective franchisee, or which states other facts which suggest such a specific level," then the franchisor must have a "reasonable basis" for the representation which must be disclosed. In this case, there is no question that the defendants' many representations (such as the 2% claim) lacked any reasonable basis in fact. The disclosure statements did not provide a "reasonable basis" for the claims. Rather, they merely added to the deceit by supplying testimonials of satisfied customers without saying that twenty to thirty calls per day were made by disgruntled customers. The district court ignored this count entirely when, in fact, it should have entered judgment in favor of the FTC.

## IV.

For the forgoing reasons, the judgment of the district court is VACATED and the case is REMANDED for the entry of judgment in favor of the FTC. On remand, the district court should fashion appropriate monetary and injunctive

---

[9]Defendants admit that the business opportunities they sell are "franchises" within the meaning of the regulations.

9

relief.[10]

---

[10]The parties stipulated that an injunction should have been granted on another count in which the court entered judgment in favor of the FTC. (The district court found that Tashman violated the Franchise Rule when he failed to list his name on the disclosure documents – information that TDC's customers might have found useful given the fact that Tashman had a $12 million judgment against him in another FTC matter and was under investigation by the SEC.) The district court never entered the injunction, however, and both parties agree that this was a "clerical error."

VINSON, District Judge, dissenting:

I agree with the majority that the district court erred, but I believe that the majority paints with too broad a brush.[1]  Instead, I would reverse only the district court's failure to address the appellees' compliance with the Franchise Rule's disclosure requirements, and I would affirm the judgment of the district court both on the FTC's Section 5 claim and the district court's refusal to entertain the FTC's "reasonable basis" Franchise Rule claim.

Section 5 of the FTC Act simply prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  Congress must have realized this vague and amorphous standard would require more concrete definition.  For that reason, Congress gave the FTC broad authority to define by rule specific acts or practices which are unfair or deceptive.  15 U.S.C. § 57a(a)(1)(B).  The FTC is also given authority to bring a civil action in district

---

[1]Initially, I acknowledge that Stephen I. Tashman is not a particularly sympathetic party. In this case, the district court ordered him to disgorge more than $420,000 in profits he had received from TDC for his violation of the Franchise Rule by failing to disclose his involvement with TDC and his past litigation history with the FTC, as alleged in Count IV of the complaint. Mr. Tashman does not challenge that ruling on appeal.  But that violation does not necessarily mean that he also violated Section 5 of the FTC Act as claimed in Count I.  The evidence indicates that TDC retained a compliance attorney and took other steps to attempt to meet the FTC Act's requirements.  TDC's counsel carefully reviewed and monitored TDC's compliance. He also reviewed "fronters'" recorded discussions with customers.  Fronters who significantly deviated from the script were fired.  Monthly sales and compliance meetings were transcribed by a court reporter and rigid adherence to the script was stressed.  While TDC may have tried to stretch the allowable limits in its business opportunity solicitations, I do not believe that the FTC has proved its Section 5 claim in this case.

11

court for violations of its rules.  15 U.S.C. § 57b(1).  Alternatively, the FTC can

also bring a direct action for injunctive relief to prevent continued violations of

Section 5.  15 U.S.C. § 53(b).  The FTC's determination that a particular practice is

unfair or deceptive is entitled to deference from the courts because:

> This statutory scheme necessarily gives the
> Commission an influential role in interpreting § 5 and in
> applying it to the facts of particular cases arising out of
> unprecedented situations.  Moreover, as an administrative
> agency which deals continually with cases in the area, the
> Commission is often in a better position than are courts
> to determine when a practice is "deceptive" within the
> meaning of the Act. . . . the Commission's judgment is to
> be given great weight by reviewing courts.
> FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.
> Ct. 1035,1042-43, 13 L. Ed. 2d 904, 914 (1965).

The FTC has determined that, as a general matter, making earnings claims in

conjunction with the offering of business opportunities constitutes an unfair or

deceptive practice unless specific procedures are followed.  As Congress intended,

those procedures are promulgated in the "Franchise Rule," 16 C.F.R. § 436.1

(2002).

In this case, Count I of the complaint charges that the appellees violated

Section 5 by making "false and misleading" representations regarding the expected

earnings for TDC's business opportunities.  The FTC's requirements for such

potential earnings representations are set out in subsections 436.1(b)(2); (c)(2); and

12

(e)(1) of the Franchise Rule: each of these subsections contain the identical

operative language that:

> At the time such representation is made, a reasonable basis
> exists for such representation . . . .

That specific violation is also separately alleged as a part of the FTC's Franchise

Rule claim in Count V of the complaint.[2]   To give appropriate regard to the FTC's

expertise in regulating the business opportunity industry, where the central issue in

the case is the basis for earnings claims, I think the correct analysis is to first

determine whether the specifics of the Franchise Rule regarding earnings claims

have been violated.[3]   With respect to the alleged Section 5 violation claimed in

Count I, this approach allows a focus on the Franchise Rule's requirement:

whether the appellees had a "reasonable basis" for their earnings claims.[4]  By

---

[2]The FTC also charged, in Count II of the complaint, that the appellees represented that vending machine purchasers would be given exclusive territories and, in Count III, that TDC, not the purchaser, would place the vending machines in desirable high-traffic locations.  After the trial, the FTC acknowledged that neither of these claims was supported by the evidence and that the appellees were properly entitled to judgment on those two counts.

[3]It is undisputed that the appellees' offering of business opportunities is subject to the Franchise Rule and that the appellees made earnings claims.  The majority relies on the second "element": whether the representation was likely to mislead customers  acting reasonably under the circumstances.  As discussed in the text, the "likely to mislead" test, under the FTC's regulations, turns on the more objective "reasonable basis," which is how I believe the Section 5 violation must be analyzed.

[4]The Franchise Rule also requires a proper disclosure of the basis for the earnings claims, but that is only alleged in the FTC's Count V claim.  It is *not* alleged as a part of the Section 5 claim in Count I.

focusing on the Franchise Rule, the inquiry must shift to hard evidence:  the appellees' preliminary research on the profit potential of calling card vending machines and the basis of the actual representations made.  Instead, the trial of this case, conducted under the ambiguous standards of Section 5, amounted to weighing the sometimes suspect and often conflicting testimony of a small percentage of disgruntled customers about their perceptions of the appellees' representations.  I agree that the district court may have misapplied the law to the facts of this case.  However, upon careful review of the record, I am compelled to agree with the district court that the FTC failed to meet its burden of proof with respect to the lack of a reasonable basis for the potential earnings representations.

Under the Franchise Rule, any oral or written representation of potential or existing earnings must have a reasonable basis,[5] and the franchisor must possess material substantiating the earnings claim which must be provided to the franchisee on request.  16 C.F.R. § 436.1(b)(2), (c)(2), (e)(2).  The franchisor must notify the franchisee of the existence of the substantiating materials when making the earnings claim.  The Franchise Rule also requires that franchisors provide franchisees with a disclosure document containing numerous required boilerplate

---

[5]The "reasonable basis" standard codified in the rule is incorporated from the case law interpreting Section 5.  A representation is likely to mislead, and thus violates Section 5, if it has the capacity or tendency to deceive; that is, it is either false or lacks a reasonable basis.  See, e.g., Thompson Medical Co., Inc. v. FTC, 791 F.2d 189, 193 (D.C. Cir. 1986).

14

provisions.[6]  16 C.F.R. § 436.1(b)(4), (c)(5), (d)(1).  Oral or written representations of potential or existing earnings must contain the number and percentage of customers which the franchisor knows have earned at least the same amounts as those claimed and the time period over which the franchisees have made the claimed earnings.  16 C.F.R. § 436.1(b)(5)(i), (c)(6)(i).  If the franchisor has no prior franchising experience in the field, this fact must be disclosed.  16 C.F.R. § 436.(b)(5)(ii), (c)(6).

To violate the Franchise Rule, the appellees must have either (1) lacked a reasonable basis for their earnings claims when made, or (2) failed to appropriately disclose the required information.  In Count V of its complaint, the FTC alleges the appellees did both; it did not prove the former, and the record is incomplete as to the latter.  The FTC bears the burden of proving by a preponderance of the evidence that the appellees lacked a reasonable basis for their earnings claims or did not properly disclose the required information.  See FTC v. Patron I Corp., 33 F.3d 1088, 1096 (9th Cir. 1994).  The district court held that the FTC failed to meet its burden under Section 5 because TDC's customers did not rely on the

---

[6]Representations of potential earnings must state:  "CAUTION  These figures are only estimates of what we think you may earn.  There is no assurance you'll do as well.  If you rely upon our figures, you must accept the risk of not doing as well."  16 C.F.R. § 436.1(b)(4).  Representations of earnings of existing franchisees must state:  "CAUTION  Some outlets have [sold][earned] this amount.  There is no assurance you'll do as well.  If you rely upon our figures, you must accept the risk of not doing as well."  16 C.F.R. § 436.1(c)(5).

representations as to potential profits in this new and risky industry.[7]  Both the parties agree that customer reliance is not the controlling inquiry.  The district court also overlooked the key inquiry for the kind of alleged violation at issue here: whether the appellees had a reasonable basis for their earnings claims.  The majority flatly concludes that the appellees had no basis for their earnings claims.  My review of the evidence indicates that, while that **may** be true, **the FTC did not prove it** at trial.

Determining the reasonableness of the basis for earnings claims is a highly factual inquiry which I would not reverse unless it appears that the district court was clearly erroneous.  See Beneficial Corp. v. FTC, 542 F.2d 611, 617 (3d Cir. 1976)(whether misrepresentation has a tendency to mislead is a highly factual

---

[7]Unlike the majority, I am not prepared to say the district court so obviously erred in this holding.  Whether representations made to customers have a tendency to mislead is more a question of fact than one of law and accordingly, we are required to review the district court's findings under the clearly erroneous standard of review.  Beneficial Corp. v. FTC, 542 F.2d 611, 617 (3d Cir. 1976).  See also FTC v. Atlantex Assoc., 872 F.2d 966, 969 n.1 (11th Cir. 1989)("[W]e cannot say that the district court's findings–that each of the defendants engaged in deceptive trade practices–are clearly erroneous.").  Viewing the record as a whole, and not in the isolated manner in which the majority presents it, I am not "left 'with the definite and firm conviction that a mistake has been made' after making all credibility choices in favor of the fact-finder's choice, in light of the record as a whole."  Meek v. Metro. Dade County, Fla. 985 F.2d 1471, 1481 (11th Cir. 1992).  Count I of the FTC's complaint only alleges that the appellees violated Section 5 by falsely claiming that purchasers could make a specified level of earnings through purchasing and operating the appellees' calling card vending machines.  The district court found that "some customers here failed and some succeeded, greatly as a result of their respective work, business sense, and luck," (R-183 at 3), and not as a result of the appellees' misrepresentations.  I cannot say this finding is clearly erroneous, but as discussed in the text, the fact that most of the customers admitted that they did not rely on the representations is probative (but not determinative).

inquiry); 62B AM. JUR. 2D Private Franchise Contracts §163 (1990)("The question of what constitutes a reasonable basis is essentially a factual issue...."). A critical determination is what level of substantiation is required in order to constitute a reasonable basis.[8] See FTC v. Patron I Corp., 33 F.3d 1088, 1096 (9th Cir. 1994). Determining the quantum of evidence necessary to carry the burden of proof is quintessentially a question for the finder of fact. In this case, the district court made no factual findings with respect to the basis for the appellees' earnings claims, and with good reason: the FTC presented no credible evidence that the appellees lacked a reasonable basis for their claims.

The record is not nearly as clear as the majority sets it out. The only evidence in the record on which the FTC bases its lack of reasonable basis argument is the testimony of defendant Mishkin. Mishkin, an associate of Tashman, was questioned regarding the "fronters'" telemarketing script, used when callers responded to TDC's advertisements. In relevant part, the script stated:[9]

> We work together getting your machines placed in the
> best possible locations....When we speak to the owner of
> the location we make sure the traffic flow is at least 500
> people per day. We believe that up to 2% of the people

---

[8]For a list of relevant factors in considering whether a potential earnings representation has a reasonable basis, see 62B AM. JUR. 2D Private Franchise Contracts §164 (1990). See also 44 Fed. Reg. 49982.

[9]Apparently the script was modified several times over the years. It is unclear as to what time period the quoted script was employed.

will buy the pre-paid calling cards.  So we're talking about selling <u>as many as</u> 10 cards per day...$140 per day.
***
<u>Let's say we're wrong and only 1% of the traffic flow buys the card</u>....You would gross $140.00 per day for two machines and of course you would make half the amount which would give you your full investment back in one year....
(R-118 Ex. 9)(emphasis added).

Mishkin's entire testimony on this "reasonable basis" issue is as follows:

Q: Do you know where that number two percent came from?
A: No.
Q: Was that based on any studies that were made by TDC?
A: I was running another operation when this deal started and I had my own terminology, my own profits where people were making....I don't know how these numbers really came up....So I can't justify those numbers.
Q: So you have no idea?
A: I mean, I know it was in the script.  I can't say how we got it.
***
Q: The script or a similar script was used right from the beginning, the start of the company TDC?
A:  No, it was changed quite a few times.
Q: That was two percent there in the beginning?
A: I'm not positive.  It might have been less.
***
Q: Were you aware of any efforts made by TDC to gather information about the experiences of people who purchased the business opportunity?
A: No, not at the beginning.
***
Q: You were not responsible for the numbers that went in the script then?

18

A:  No.

*** 

Q: ....Where did the numbers come that were used in the script?

DEFENSE COUNSEL: Your honor, he's testified that he did not know.

THE COURT: He said he did not know, he said some numbers came from a business he had before he merged with them.  Is there anything else you want to add, sir, to that?

A: Well, in the beginning, you wouldn't know the numbers.  How would you know numbers?  I mean you can't know them.  A lot of it came from another business opportunity I was doing.  There's no way you could justify how much they were going to make in the beginning.

*** 

Q: Was the previous business you owned, where some of these numbers came from, was that related in any way to the sale of business opportunities selling...prepaid phone cards?

A: No.  It was completely different.  It was a kids [crane] machine.

*** 

Q: Sir, do you remember any test marketing of the company when you first started?

A: I think [Tashman] put a machine out locally around here.

Q: Isn't that, in fact, how you test marketed to get the numbers for the first ads?

A: I would hope not because that didn't bring any card sales.

Q: But do you believe there was test marketing?

A: Do I?  I guess.

(R-189 at 792-814.)

From this exchange, the majority finds, as a matter of <u>fact</u>, that TDC's basis for its

19

earnings claims came from Mishkin's prior business and concludes as a matter of law that this basis is unreasonable. The majority also finds as a fact that TDC test marketed a machine that did not sell any calling cards when Mishkin only "thinks" and "guesses" it happened. At best, Mishkin's testimony is ambiguous as to the basis for the earnings claims. He does not know whether some of the information came from his prior business. Drawing all reasonable factual inferences in the appellees' favor (as we must), this testimony indicates that Mishkin has <u>no knowledge whatsoever</u> as to the basis for the numbers. I cannot make the majority's inferential leap from this scant evidence. The FTC, not the appellees, bore the burden of proving that the earnings claims had no reasonable basis. There is no evidence in the record as to what <u>was</u> the basis for the earnings claims. Importantly, there is also no evidence that there was <u>no</u> reasonable basis. A fair reading of Mishkin's testimony is that he did not make the earnings claims and that he does not know how, or on what basis, they were made. The FTC put on no witnesses who may have had knowledge of TDC's basis, or lack thereof, for the earnings claims. Mishkin plainly states that he has no knowledge of the basis of the earnings claims. His testimony alone is simply not enough to meet the FTC's burden. Because this is the only evidence the FTC puts forth as to the basis (or lack thereof) for the appellees' earnings claims, the district court was correct in

finding that the FTC failed to meet its burden of proof. Additionally, after the initial start-up period and during most of the years challenged by the FTC, TDC's earnings claims were based on actual earnings from existing customers.[10] I cannot say this was unreasonable.

At this point, I return to the Section 5 claim alleged in Count I of the FTC's complaint. The FTC alleges that TDC's representations were "false and misleading and constitute deceptive acts or practices." Representations violate Section 5 if the FTC proves that, based on a common sense net impression of the representations as a whole, the representations are likely to mislead reasonable customers to their detriment. Removatron Int'l Corp v. FTC, 884 F.2d 1489, 1497 (1st Cir. 1989); Beneficial Corp. v. FTC, 542 F.2d 611, 617 (3d Cir. 1976). In the context of a business opportunity offering, both the advertisements and the disclosure documents must be construed together to evaluate the net impression of the representations to consumers. Consumers need not be actually deceived, the representations need only have the tendency or capacity to deceive. Trans World

---

[10]The FTC argues that the customers cited by the district court and TDC were neither "typical" nor "average." Neither Section 5 nor the Franchise Rule constrains business opportunity offerors' earnings claims to typical or average customers. In fact, the Franchise Rule's requirement that earnings claims be accompanied with a percentage of franchisees who obtained those earnings contemplates that a claim may have a reasonable basis though based on a small sample as long as this fact is adequately disclosed. TDC disclosed that its earnings claims were "from some of our most successful distributors which comprise less than 1% of our customers."

21

Accounts, Inc. v. FTC, 594 F.2d 212, 214 (9th Cir. 1979). Finally, while customer reliance is not controlling, how consumers resolve ambiguities in representations made to them is highly probative of whether the representations have a tendency or capacity to deceive. See FTC v. World Vacation Brokers, Inc., 861 F.2d 1020, 1030 (7th Cir. 1988). Here, the district court found that TDC customers were not misled by TDC's alleged representations and that they had no expectation of achieving the potential profits the FTC alleges TDC made. Many customers testified no earnings promises were made to them. These factual findings are highly probative of whether TDC's representations had a tendency or capacity to deceive. There is no evidence that the earnings claims were "false." Most importantly, the FTC has failed to prove that TDC did not have a reasonable basis for its representations (which is the FTC's own likely-to-mislead "test" for potential earnings representations in business opportunity situations). Therefore, the FTC has also failed to prove a Section 5 violation as alleged in Count I.

However, it appears that the appellees may not have satisfied the Franchise Rule's disclosure requirements for their earnings claims, which is the second part of the FTC's claim in Count V. After the initial conversation with a "fronter," potential customers were mailed a packet that included a disclosure document, which changed several times over the years. The FTC claims that this disclosure

22

document was defective because it failed to substantiate TDC's statement that two percent of the passers-by would purchase from its vending machines. As the fronter script indicates, TDC represented that it "believed" that "up to two percent" of passers-by would purchase calling cards. This may be construed as a statement of "facts which <u>suggest</u> a specific level" of potential sales, 16 C.F.R. §436.1(b) (emphasis added), requiring substantiation in the disclosure documents. It appears that TDC may not have disclosed the basis for its potential sales claim, though it was required to disclose "the material bases and assumptions" for its claim. 16 C.F.R. § 436.1(b)(3). The Franchise Rule's disclosure requirements ensure that prospective franchisees possess all of the information necessary to make an informed judgment about the legitimacy of a franchisor's earnings claims. The district court made no findings of fact on this disclosure issue, nor did it address it at all. The district court's failure to address TDC's Franchise Rule disclosures was error. I would reverse the district court only on this point, and remand in order to give the trial court an opportunity to do so with respect to the second half of the claim in Count V.