**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**DAVISON ASSOCIATES, INC.,**
**et al., Defendants.**

**No. CIV.A. 97–1278.**

United States District Court,
W.D. Pennsylvania.

March 19, 2006.

Steven W. Balster, Federal Trade Commission, Larissa L. Bungo, Federal Trade Commission, Stephen Calkins, Federal Trade Commission, Cleveland, OH, for Federal Trade Commission, Plaintiff.

Thomas W. Corbett, Jr., Thorp, Reed & Armstrong, Pittsburgh, PA, for Davison & Associates, Inc., Defendant.

George H. Crompton, Davison Design & Development, Inc., Pittsburgh, PA, for Davison & Associates, Inc., Manufacturer's Support Services, Inc., Barbara Davison,

Barbara Miele, George M. Davison, III, Gordon M. Davison, Defendants.

Brenda W. Doubrava, Federal Trade Commission, Cleveland, OH, for Federal Trade Commission, Plaintiff.

Cynthia Reed Eddy, Johnson & Eddy, Pittsburgh, PA, for Davison & Associates, Inc., Manufacturer's Support Services, Inc., Barbara Davison, Barbara Miele, George M. Davison, III, Gordon M. Davison, Defendants.

J. Alan Johnson, Johnson & Eddy, Pittsburgh, PA, for Davison & Associates, Inc., Manufacturer's Support Services, Inc., Barbara Davison, Barbara Miele, George M. Davison, III, Gordon M. Davison, Defendants.

Michael Milgrom, Federal Trade Commission, Cleveland, OH, for Federal Trade Commission, Plaintiff.

Gordon W. Schmidt, McGuire Woods, Pittsburgh, PA, for Davison & Associates, Inc., Manufacturer's Support Services, Inc., Barbara Davison, Barbara Miele, George M. Davison, III, Gordon M. Davison, Defendants.

Albert W. Schollaert, United States Attorney's Office, Pittsburgh, PA, for Federal Trade Commission, Plaintiff.

Brinley H. Williams, Federal Trade Commission, Cleveland, OH, for Federal Trade Commission, Plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LANCASTER, District Judge.

This is an action under section 13(b) of the Federal Trade Commission Act, 15 U.S.C.A. § 53(b). The Federal Trade Commission (the "Commission") alleges that defendants Davison Associates, Inc., Manufacturer's Support Services, Inc., George M. Davison, III, Gordon Davison,

and Barbara Miele–Davison, have engaged in deceptive practices in connection with their invention promotion business in violation of section. 5 of the Federal Trade Commission Act. 15 U.S.C.A. § 45(a). Plaintiff seeks a permanent injunction and ancillary equitable relief.

A bench trial began on June 20, 2005. After three weeks of testimony, the parties filed proposed findings of fact and conclusions of law for the court's consideration. The parties have made all submissions and the court is prepared to set forth its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, and render its judgment.

## I. *FINDINGS OF FACT*

The following facts were not in dispute:

1. The court has subject matter jurisdiction over plaintiff's claims pursuant to 28 U.S.C.A. §§ 1331, 1337(a), and 1345, and 15 U.S.C.A. §§ 45(a) and 53(b).

2. Venue is proper under 28 U.S.C.A. §§ 1391(b) and (c) and 15 U.S.C.A. § 53(b).

3. Defendants' course of trade is in or affecting commerce, within the meaning of Section 4 of the Federal Trade Commission Act, 15 U.S.C.A. § 44.

4. The Commission brought this case against two corporate and four individual defendants on July 15, 1997.

5. The two corporate defendants are: (1) Davison & Associates, Inc., now known as Davison Design and Development, Inc. ("Davison"); and (2) Manufacturer's Support Services, Inc. ("MSSI").

6. The four individual defendants are: (1) George M. Davison III (President and CEO of Davison); (2) Thomas Dowler (who is no longer involved in this matter); (3) Gordon M. Davison (an employee of Davison and officer of MSSI); and (4) Barbara Miele–Davison (an employee of Davison until 2002).

7. A finding of liability against Davison will result in the three remaining individual defendants, and MSSI, being found individually liable under the Federal Trade Commission Act.

8. On July 15, 1997 this court entered a Temporary Restraining Order ("TRO"), which was extended by stipulations of the parties dated July 18, 1997, July 23, 1997, and July 30, 1997.

9. Pursuant to the TRO, Davison was forced to make certain changes to its sales and marketing materials, and to the general way that it did business. Davison was specifically prohibited from making the misrepresentations alleged in the Amended Complaint.

10. Since 1989 Davison has been in the business of selling services to amateur inventors.

11. Defendants advertise their services in the classified section of magazines, and on-line. After a consumer contacts defendants, defendants send an initial form on which the consumer gives a general description of his invention.

12. Both Pre–Complaint and Post–Complaint, defendants offer services to about 66% of the consumers sending in an initial form.

13. Defendants' services have always been sold in two phases.

14. Pre–Complaint, the first phase consisted of a Research Agreement. Under the Research Agreement, defendants would prepare a portfolio that included a patent search, an engineer's review of feasibility, a conceptual drawing, industry related data, and a search of competing products. The cost of this service was less than $800.00.

15. Pre–Complaint, defendants also offered expanded first-phase services, which included a color rendering Virtual Reality Presentation. This expanded service cost more than $3,500.

16. Pre–Complaint, more than half of the time defendants would conclude at the end of the first phase that the consumer should move forward with commercialization of his product idea. Defendants stopped using the "should be commercialized" recommendation after the Commission filed its Complaint.

17. Pre–Complaint, phase two of defendants' services consisted of a Product Representation Agreement under which defendants attempted to locate a corporation interested in licensing the consumer's product idea. This agreement had a term of two years. The agreement could be purchased on an hourly basis, or by paying a flat fee, ranging from $8,000.00 to $12,000.00, plus a percentage of royalties. The cost of creating production drawings or a prototype for submission to corporations was included in this agreement. The Agreement contained an express acknowledgment that the consumer had not been promised financial gain or profits.

18. Post–Complaint, phase one of defendants' services consist of two agreements: a Pre–Inventegration Services Agreement at a cost of approximately $700.00, and a Contingency Agreement, at a cost of 10% of future licensing royalties.

19. The Pre–Inventegration Agreement results in a portfolio containing product research, a patent design search, and a provisional patent application. This portfolio is similar to the one provided under the Research Agreement, Pre–Complaint. The Pre–Inventegration Agreement states that there are no guarantees of financial gain and that the purpose of the research is not to evaluate market potential or patentability.

20. The Contingency Agreement is the agreement under which defendants attempt to obtain a license for the consumer's product with a corporation. The Contingency Agreement states that the consumer will be responsible for obtaining a virtual reality presentation and/or prototype of his idea for submission to corporations. The agreement states that the consumer can obtain these items either from defendants or another source, subject to defendants' approval. This agreement also contained a statement that no license is guaranteed and that the majority of products are not successfully licensed.

21. Post–Complaint, phase two of defendants' services consist of a Production Sample Presentation Agreement under which defendants agree to produce a virtual reality model and/or prototype of the consumer's idea for presentation to corporations. This agreement can be purchased at an hourly rate, or for a flat fee, ranging from $8,000.00 to $14,000.00, plus a percentage of future royalties. This phase two agreement is offered once a corporate match is found for the consumer's product idea, which happens about 80% of the time. This agreement contains statements that there are no guarantees of financial success.

22. Less than one percent of defendants' revenues come from royalty income.

23. Both Pre–Complaint and Post–Complaint contracts contain integration clauses stating that the agreement constitutes the entire agreement between the parties and that any verbal agreements are null and void.

24. The American Inventor's Protection Act, 35 U.S.C.A. § 297 ("AIPA"), requires invention-promotion firms to make the following disclosures before selling their services: (1) total number of inventions evaluated for commercial potential in the past 5 years, as well as the number of these inventions that received positive evaluations, and the number that received negative evaluations; (2) the total number of customers who have contracted with the invention promoter in the past 5 years, not including customers who have purchased, among other things, research or other non-marketing services; (3) the total number of customers known by the invention promoter to have received net financial profit as a direct result of the invention promotion services; (4) the total number of customers to have received licensing agreements as a direct result of the invention promotion services; and (5) the names and addresses of all previous invention promotion companies with which the invention promoter or its officers have been affiliated in the previous 10 years.

25. In 2002, defendants' AIPA disclosure stated:

> Client acknowledges that Davison has assisted eight hundred and seventeen clients wanting licensing services in the last five years. Because Contingency Agreements last for six months, Davison is unable to determine if a Client has licensed or marketed his/her product idea or received financial gain after the expiration of the Contingency Agreement. However, Davison is aware of thirty projects that have been licensed and ten that have resulted in financial gain to the project owner since 1990. Davison is also aware that one hundred twenty pro-

jects are under corporate licensing review.

26. In the first half of 2005, defendants received 40,516 idea submissions from consumers. From these, defendants offered phase one Pre–Inventegration Services Agreements to 26,309, 4,371 of whom purchased the phase one services. Defendants then offered phase two Production Sample Presentation Agreements to 3,455 of the 4,371 phase one clients, 920 of whom purchased and fully paid for the phase two services.

27. In its Amended Complaint, the Commission alleged that defendants made the following six false and misleading representations, either expressly or by implication, in connection with the sale of their services:

(a) Consumers who buy defendants' invention-promotion services stand a reasonably good chance of realizing financial gain.

(b) Defendants' invention-promotion services helped many of their customers' invention ideas become profitable products.

(c) Defendants' invention-promotion services helped some or more of the following invention ideas become profitable products: Bark Buddies, the Spot–Lite, the Snag–Buster, the Puzzle Sorter, and the EnviroGolf.

(d) Defendants have a vast network of corporations with whom they have ongoing relationships and regularly negotiate successful licensing agreements.

(e) Defendants' invention marketing services are necessary for consumers to license their invention ideas.

(f) Defendants prepare objective and expert analyses of the patenta-

bility and marketability of consumers' invention ideas.

The following facts were in dispute, and the court finds, by a preponderance of the evidence, as follows:

A. *Reasonably Good Chance of Financial Gain*

28. Based on the overall, common sense, net impression on a reasonable consumer, defendants falsely represent, both directly and by implication, that consumers who buy their services stand a reasonably good chance of realizing financial gain by:

(A) representing that they are selective as to whom they offer services based on the quality, value, and/or originality of a consumer's idea;

(B) representing that they have a genuine stake in the consumer's invention through royalties, when in fact, fees charged, and not royalties collected, are the main source of defendants' income; and

(C) misrepresenting their track record.

29. Both Pre–Complaint and Post–Complaint, defendants make express and implied statements that create the overall, common sense, net impression on a reasonable consumer that they are selective about those to whom they offer services. In fact, defendants offer phase one research services to 66% of the consumers submitting ideas. Pre–Complaint, more than 50% of consumers purchasing phase one services were offered phase two services. Post–Complaint, approximately 80% of consumers purchasing phase one services are offered phase two services.

30. Defendants' numerous statements, both Pre–Complaint and Post–Complaint, regarding the value, desirability, or originality of, or excitement surrounding a consumer's idea create the overall, common sense, net impression in a reasonable consumer that defendants have selected this consumer's particular idea, to the exclusion of many others. This, in turn, creates the overall, common sense, net impression in a reasonable consumer that there is some reasonable chance of financial success for those ideas that are specially selected. It is reasonable for a consumer to assume that an idea that has been evaluated and selected for further work to the exclusion of other ideas must have some possibility of success.

31. While defendants have curtailed their sales language regarding their enthusiasm for, or the originality of an idea, and no longer refer to an idea as having passed "review board" scrutiny, defendants still try to convince consumers that they select a limited number of ideas for further work, when the vast majority of consumers are offered further services. In fact, Post–Complaint, defendants offer phase two services to 30% more consumers than they did Pre–Complaint.

32. Both Pre–Complaint, and Post–Complaint, defendants create the overall, common sense, net impression of a reasonably good chance of financial gain through contingency arrangements. Although contingency arrangements are not *per se* illegal, defendants' sales techniques regarding the contingency arrangement create the overall, common sense, net impression on a reasonable consumer that defendants have a shared interest in the consumer's idea.

33. For example, Post–Complaint, a reasonable consumer would conclude that a company is only going to take a shared interest in an idea, and "work

for free" under the Contingency Agreement, if an idea has some reasonable possibility of financial success. In reality, and unbeknownst to the consumer, there is no real shared interest, because royalty payments from consumer licenses are a minuscule portion of defendants' revenues. Defendant's greatest source of income is the fees charged for prototyping and virtual reality services, which, in practice, must be purchased in order to proceed to the licensing stage.

34. Both Pre–Complaint and Post–Complaint, defendants misrepresent their track record. The overall, common sense, net impression on a reasonable consumer of defendants' track record overstates the reasonable possibility of financial gain. In particular:

(a) Defendants misrepresent their track record in their AIPA disclosure by hiding the information in a paragraph about how notices are to be sent and by including extraneous information, such as projects "under corporate licensing review". They also create the impression of greater success by not reporting the total number of phase one customers buying a Pre–Inventegration portfolio, which is in the thousands. Although research is excepted from AIPA reporting requirements, as defendants have structured their business Post–Complaint, this initial report is an integral part of defendants' licensing services. From defendants' first contacts with consumers, the phase one Pre–Inventegration Services Agreement is characterized as the first step in negotiating with corporations for a license. For example, the research conducted under the Agreement is described as "needed" in order to proceed to licensing. A sales script says that defendants need to get the research "out of the way" so they can start "sourcing corporations" for licensing. Another sales script to be used before the work under the Pre–Inventegration Services Agreement has even been completed states there is good news for the consumer about "target corporations". Under these circumstances, research is inseparable from the licensing part of defendants' business. Therefore, defendants' failure to disclose that thousands of people are provided with Pre–Inventegration portfolios, yet, at best, only dozens obtain licenses, significantly misrepresents their track record. Although defendants have not been charged with violating the AIPA, and it is unclear how the research exception of the AIPA is to be interpreted, the above is evidence of how defendants shew their track record in order to imply a reasonably good chance of financial gain.

(b) Defendants also misrepresent their track record by contending that the Contingency Agreement and Production Sample Presentation Agreement are unrelated. As a result, defendants conclude that any consumer who made $1.00 in royalties realized a profit because the Contingency Agreement is "free". However, these two agreements are closely intertwined and the significant cost of the Production Sample Presentation Agreement must be factored into profitability in order to give consumers truthful information regarding defendants' track record. Defen-

dants' current Operations Manual characterizes prototyping services as "necessary" to the overall licensing services provided by defendants. In addition, the Inventegration "flow chart" included with defendants' introductory marketing materials includes the purchase of prototyping services as a step on the path to obtaining a corporate license. The consumer must buy the Production Sample Presentation Agreement to fulfill the Contingency Agreement and proceed to the only possible money-making step of defendants' services—licensing. The two agreements are intertwined. Although, when correctly considered in determining profitability, this would cause only a slight change in the number of consumers who realized a profit this is further evidence of defendants' attempts, even Post–Complaint, to falsify their track record. (c) Pre–Complaint, defendants misrepresented their track record in the "numbers letter" by using the above, and other techniques, such as including licenses obtained by people affiliated with defendants.

35. The disclaimers used by defendants, both in written and oral form, to the effect that there are no guarantees of financial success or of a license are not sufficiently prominent and unambiguous and do not clearly, conspicuously, and directly address the misrepresentations made regarding defendants' track record, and are, therefore, ineffective.

B. *Many Products Are Profitable*

36. Based on the overall, common sense, net impression on a reasonable consumer defendants do not falsely represent that their invention-promotion services have helped "many" of their customers' invention ideas become profitable products. Regardless of how defendants inflate their track record, there is no reasonable implication from defendants' overall marketing and sales materials that "many" consumers have made a profit as a result of using their services.

37. It is always clear to the reasonable consumer that success and profitability are the exception, rather than the rule. While defendants may use unlawful techniques to convince consumers that they have the rare idea that falls into the exception category, they do not state or imply that "many" people make a profit. Rather, their sales techniques rely on convincing the consumer that the opposite is true.

C. *Profitability of Specific Products*

38. Based on the overall, common sense, net impression on a reasonable consumer defendants misrepresented that their invention-promotion services helped some, or more, of the following invention ideas become profitable products: Bark Buddies, the Spot–Lite, the Snag–Buster, the Puzzle Sorter, and the EnviroGolf. A reasonable consumer would conclude that "success story" products specifically featured by defendants as having been advertised on MTV, sold "all over the world", and purchased by "thousands of parents" have some level of financial success. While it is true that defendants never use the term "profitable" in reference to these particular products, based on the overall, common sense, net impression, a reasonable consumer would equate such specific state-

ments of successful sales and marketing with profit.

39. Furthermore, the statements that defendants make about at least some of these products are blatantly false. For example, while defendants claim that the Puzzle Sorter has been sold worldwide, defendants' records reflect no actual sales of this product in the United States, or elsewhere.

40. Even though defendants have stopped referring specifically to Bark Buddies, the Spot–Lite, the Snag–Buster, the Puzzle Sorter, and the EnviroGolf, defendants still perpetuate consumers' misunderstandings regarding the profitability of specific products. For instance, defendants refuse, to this day, to answer consumer inquires regarding the exact profitability or success of specific products. Post–Complaint sales scripts instruct staff members to refuse to answer such questions on the basis of confidentiality concerns.

### D. *Special Access to Corporations*

41. Based on the overall, common sense, net impression on a reasonable consumer defendants falsely represent that they have a vast network of corporations with whom they have ongoing, special relationships, and with whom they regularly negotiate successful licensing agreements. Pre–Complaint, defendants told consumers explicitly that they worked directly with manufacturers, had close personal contacts, and cut through the "red tape" and the "old boys' network" to obtain licenses for their clients. Although this may be technically true of a handful of smaller companies, defendants implied that they had such relationships with hun-

dreds of large, nationally known companies, which they did not.

42. Even Post–Complaint defendants state, in a sales script used early in the consumer's relationship with defendants, that because defendants develop products for companies on an ongoing basis they have the ability to present outside concepts where the average person would not. Again, although this may be literally true of a handful of companies, the overall, common sense, net impression on a reasonable consumer of defendants' marketing techniques, still today, is that they are selling special access to hundreds of companies, when in fact there is little, if any, special access.

43. Defendants claim to have close working relationships with specific companies when defendants' submission procedures do not even meet the company's requirements for the submission of unsolicited ideas.

44. Defendants create the impression of special access by stating that they meet, regularly, with numerous corporations to present new ideas to them. Even Post–Complaint, in the Inventegration "flow chart", defendants imply that presentations and meetings occur in person. The evidence at trial showed that this rarely happens.

45. Defendants' misrepresentations regarding special access are exacerbated by false claims of confidentiality. Even Post–Complaint, when consumers ask for details regarding a company's interest in their idea before agreeing to purchase the Production Sample Presentation Agreement, defendants re-

fuse, citing confidentiality concerns. Such confidentiality claims are suspect because all defendants have done at that point is pull the name of a company that makes the same type of products as the consumer's invention from their computer database.

46. Even Post–Complaint, through the corporate montage, defendants imply relationships with companies that have not even registered with defendants as being willing to accept new product ideas from them.

### E. *Necessity of Services*

47. Based on the overall, common sense, net impression on a reasonable consumer defendants misrepresent that their invention marketing services are necessary for consumers to license their invention ideas to corporations. Both Pre–Complaint and Post–Complaint, defendants explicitly state that their virtual reality/prototype product presentation portfolios will get the consumer's idea "taken seriously" and are a "necessity" when working with large corporations.

48. Although a reasonable consumer expects a salesperson to portray his products in the best light possible and to try to convince the consumer that he is selling something that the consumer must have, defendants claim to have expertise and experience in licensing products to large corporations. They use this perceived position of superior knowledge over the consumer to convince the consumer that when a salesperson says that something is needed in order to proceed, it is.

### F. *Patentability and Marketability Analysis*

49. Based on the overall, common sense, net impression on a reasonable consumer we find that, Pre–Complaint, defendants misrepresented that they prepared objective and expert analyses of the patentability of consumers' invention ideas.

50. Pre–Complaint, defendants stated that a patent search was conducted in order to "understand the viability of your new product ideas". Following this statement, defendants stated that their registered patent agent conducted the search and that "only a registered patent attorney or patent agent can advise you whether protection of your idea or invention is available under the patent...laws." The report went on to summarize various forms of intellectual property protection and to warn the consumer of certain actions that could jeopardize those rights. The overall, common sense, net impression of this presentation of the patent search on a reasonable consumer is that defendants' patent agent is qualified to determine patentability, and did so in this case. Any attempted disclaimers were ineffective.

51. Based on the overall, common sense, net impression on a reasonable consumer we find that, both Pre–Complaint and Post–Complaint, defendants misrepresent that they prepare objective and expert analyses of the marketability of consumers' invention ideas.

52. Both Pre–Complaint and Post–Complaint, defendants include a section in their research report regarding the presence of competing, or conflicting, products currently

on the market. Defendants explain that "[i]t is imperative that our firm allocate a substantial amount of time to discover similar or competing products in the marketplace" in order to assist in "making decisions in the future." Sales calls also address the presence of similar products in the marketplace, and/or the uniqueness of the consumer's product. These statements create the overall, common sense, net impression on a reasonable consumer that defendants are studying the market in order to arm themselves, and the consumer, with information needed to assess the potential market for a product.

53. Although defendants state that no one can predict how a product will actually sell until it is for sale in the marketplace, that is not an effective disclaimer. Defendants are not accused of guaranteeing sales, but of providing consumers with purported objective and expert analysis of marketability. The purported disclaimer does not dispel the overall impression that defendants are gathering data about the market in order to assist defendants and the consumer in making an educated guess as to the possible market potential of a product.

54. Based on the overall, common sense, net impression on a reasonable consumer we find that, Post–Complaint, defendants do not misrepresent that they prepare objective and expert analyses of the patentability of consumers' invention ideas. Rather, defendants now explicitly state that they are not performing this service. Because defendants now clearly, conspicuously, and directly disclaim that they give patentability assessments, and because the disclaimer is prominent, unambiguous and presented at the same time that the patent search is presented, the overall impression of the communication becomes non-deceptive, and the disclaimer is effective.

## II. CONCLUSIONS OF LAW

1. The Federal Trade Commission Act prohibits deceptive acts or practices in or affecting commerce. 15 U.S.C.A. § 45(a)(1).

2. Whether a particular practice has a tendency to deceive or mislead is an impressionistic determination more closely akin to a finding of fact than to a conclusion of law. *See Beneficial Corp. v. F.T.C.*, 542 F.2d 611, 617 (3d Cir.1976).

3. To establish liability under section 5 of the Federal Trade Commission Act, the Commission must establish that there was a material representation which was likely to mislead consumers acting reasonably under the circumstances. *See F.T.C. v. Tashman*, 318 F.3d 1273, 1277 (11th Cir.2003).

4. To be actionable a misrepresentation or practice need not be made with an intent to deceive. *See Beneficial Corp.*, 542 F.2d at 617.

5. A practice or statement is material if it contains information that is important to a consumer's purchasing decision such as information relating to the economic viability of a transaction or the central character of the product or service. *F.T.C. v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502, 529 (S.D.N.Y.2000) (citing cases).

6. In determining whether a practice is likely to mislead, the fact finder must consider the overall, common

sense, net-impression of the practice on a reasonable consumer. *Beneficial Corp.*, 542 F.2d at 617; *Am. Home Prod. Corp. v. F.T.C.*, 695 F.2d 681, 687 (3d Cir.1982). The practice must be viewed as a whole without emphasizing isolated words or phrases. *Beneficial Corp.*, 542 F.2d at 617.

7. Disclaimers or curative language must be "sufficiently prominent and unambiguous" such that the overall net-impression of the communication becomes non-deceptive. *Removatron, Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir.1989).

8. The Commission has found that integration clauses do not shield defendants where their misrepresentations have resulted in consumer injury. *In re AMREP Corp.*, 102 F.T.C. 1362, 1667–68 (1983).

9. Under section 13(b) of the Federal Trade Commission Act, a court may grant permanent injunctive relief where the violation is ongoing or there is a cognizable danger of recurrent violation. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In determining whether there is a danger of recurrence, a court may consider the bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of past violations. *Id.*

10. The authority to grant a permanent injunction includes the authority to order any other ancillary equitable relief necessary to effectuate the exercise of the powers granted under section 13(b). *F.T.C. v. Febre*, 128 F.3d 530, 534 (7th Cir.1997); *F.T.C. v. Gem Merch. Corp.*, 87 F.3d 466, 468–69 (11th Cir.1996); *F.T.C. v. Amy Travel Service, Inc.*, 875 F.2d 564, 571 (7th Cir.1989).

11. Ancillary equitable relief may take the form of disgorgement of the full amount lost by customers, without regard to defendant's profits. *Commodity Futures Trading Comm'n v. Am. Metals Exchange Corp.*, 991 F.2d 71, 77 (3d Cir.1993); *Febre*, 128 F.3d at 537; *F.T.C. v. Medicor LLC*, 217 F.Supp.2d 1048, 1057–58 (C.D.Cal.2002).

12. We find that defendants' practice of stating or implying that consumers have a reasonably good chance of realizing financial gain is material to a consumer's purchasing decision and is likely to mislead consumers acting reasonably under the circumstances based on the overall, common sense, net impression of the practice.

13. We find that defendants' practice of stating or implying that defendants' services helped particular products become profitable is material to a consumer's purchasing decision and is likely to mislead consumers acting reasonably under the circumstances based on the overall, common sense, net impression of the practice.

14. We find that defendants' practice of stating or implying that they have a vast network of corporations with whom they have special relationships is material to a consumer's purchasing decision and is likely to mislead consumers acting reasonably under the circumstances based on the overall, common sense, net impression of the practice.

15. We find that defendants' practice of stating or implying that their invention marketing services are necessary for consumers to license

their invention ideas to companies is material to a consumer's purchasing decision and is likely to mislead consumers acting reasonably under the circumstances based on the overall, common sense, net impression of the practice.

16. We find that defendants' practice of stating or implying that they prepare objective and expert analyses of the marketability of a consumer's invention idea is material to a consumer's purchasing decision and is likely to mislead consumers acting reasonably under the circumstances based on the overall, common sense, net impression of the practice.

17. We find that defendants' Pre–Complaint practice of stating or implying that they prepare objective and expert analyses of the patentability of a consumer's invention idea is material to a consumer's purchasing decision and is likely to mislead consumers acting reasonably under the circumstances based on the overall, common sense, net impression of the practice.

18. We find that the integration clauses in defendants' contracts do not shield them from liability because this case is not controlled by state contract law, and because consumer injury resulted from defendants' misrepresentations.

19. Permanent injunctive relief is appropriate in this case because there are ongoing violations and there is a cognizable danger of recurrent violation. Even after the court issued a Temporary Restraining Order, which was later extended by stipulation, defendants continued to engage in deceptive practices, albeit in slightly different forms. Based on this past pattern of conduct, there is a very real danger that defendants will alter their business again, yet continue to engage in wrongdoing.

20. In order to effectuate the exercise of granted powers, we order other ancillary equitable relief in the form of consumer redress in the amount of $26 million. This amount represents revenues earned by defendants Pre–Complaint in the amount of $8 million. This amount also represents the $18 million that Mr. Davison testified defendants earned in 2004. Plaintiffs presented insufficient evidence to establish defendants' earnings in other years. Even though discovery was not available regarding those years, plaintiffs could have presented some evidence regarding earnings through defendants' officers of agents, or otherwise. The court has no evidentiary basis to make a finding of any revenues or income in the years since the Complaint was filed, other than in 2004. Regardless, being an equitable remedy, we find that this amount is appropriate to provide consumers with some form of financial recovery, while not exacting a penalty on defendants.

An Order for a Final Judgment and a Permanent Injunction follow.

## ORDER FOR PERMANENT INJUNCTION

AND NOW, this 17th day of March, 2006, for the reasons stated in the accompanying Findings of Fact and Conclusions of Law:

## I. *MISREPRESENTATIONS PROHIBITED*

It is HEREBY ORDERED that Defendants are enjoined from making, or assist-

ing others in making, any material false representation or material omission in connection with providing any research, patent, marketing, and/or invention-promotion services (collectively "services"), including, but not limited to any misrepresentation that:

(a) Defendants are selective in deciding to whom services will be offered;

(b) Defendants have a combined stake in the consumer's invention because they "work for free" and/or receive significant income from royalties;

(c) falsely states defendants' track record in terms of number of consumers contracted with, number of consumers realizing a net profit, or number of arms-length licenses obtained;

(d) Defendants' invention-promotion services helped any specific invention ideas become successful products without disclosing whether the consumer realized a net profit;

(e) Defendants have a vast network of corporations with whom they have ongoing relationships and regularly negotiate successful licensing agreements;

(d) Defendants' invention marketing services are necessary for consumers to license their invention ideas; and

(f) Defendants prepare objective and expert analyses of the marketability or patentability of consumers' invention ideas.

For the purposes of this Order, services include both phases of defendants' services and all agreements sold thereunder, including the Contingency Agreement, the Pre–Inventegration Services Agreement, and the Production Sample Presentation Agreement, or any other similar agreements.

## II. *AFFIRMATIVE DISCLOSURE STATEMENT*

IT IS FURTHER ORDERED that defendants shall furnish a retainable copy of an Affirmative Disclosure Statement to each prospective client within three business days of receipt of the first communication from the client disclosing a new product idea. The Affirmative Disclosure Statement must be set forth in a separate document that contains no other information and must state in a clear and conspicuous manner the following: (1) the total number of consumers who submitted new product ideas to defendants during the five year period ending with the date of the Affirmative Disclosure Statement; (2) the total number of consumers who were offered a Pre–Inventegration Services Agreement (or any similar agreement that results in a patent, market, and/or design portfolio); (3) the total number of consumers who were offered a Contingency Agreement (or any similar agreement under which defendants seek to obtain licensing for a new product idea on behalf of a consumer); (4) the total number of consumers who signed or purchased a Pre–Inventegration Services Agreement (or any similar agreement that results in a patent, market, and/or design portfolio); (5) the total number of consumers who signed a Contingency Agreement (or any similar agreement under which defendants seek to obtain licensing for a new product idea on behalf of a consumer); (6) the total number of consumers who were offered a Production Sample Presentation Agreement (or any similar Agreement under which a virtual reality or prototype is created); (7) the total number of consumers who signed or purchased a Production Sample Presentation Agreement (or any similar agreement under which a virtual reality or prototype is created); (8) the total number of consumers, unaffiliated with defendants, who obtained a written license with a company or corporation unaffiliated with defendants for their new product; (9) of the consumers who obtained a written license with an unaffiliat-

ed company or corporation for their new product, the number of consumers who have made more money from royalties than they have paid, in total, under any and all Agreements, to defendants; and (10) the percentage of defendants' income that has come from royalties paid to defendants under the licenses identified in subsection 8. This Affirmative Disclosure Statement is needed due to defendants' blatant, varied, and repeated misrepresentations regarding their selectivity and success rate, and the importance of royalties to their relationship with consumers. It shall be in addition to and in no way a substitute for any disclosure required under the American Inventors Protection Act, or any other state or federal statute. The information contained in the Affirmative Disclosure Statement shall be current as of a date no more than 60 days prior to the date the Affirmative Disclosure Statement is furnished to the consumer, and that date shall appear on the Affirmative Disclosure Statement.

Defendants shall request that the consumer: (1) acknowledge receipt of the Affirmative Disclosure Statement, in writing, on a duplicate of the Affirmative Disclosure Statement; and (2) return the duplicate document to defendants. Defendants shall not initiate any contact with the prospective client for three business days after furnishing the Affirmative Disclosure Statement to the consumer, and shall not accept any funds from a consumer before receiving the signed, duplicate, acknowledgment of the Affirmative Disclosure Statement.

## III. *OTHER BUSINESS PRACTICES*

### A. *Profitability of Specific Products*

IT IS FURTHER ORDERED that to the extent defendants feature, refer to, highlight, or advertise specific consumer products or ideas, in conjunction with that reference defendants shall set forth whether the consumer realized a net profit on the product. A net profit occurs where the total royalties paid to the consumer are greater than the total amount of fees paid by the consumer to defendants under any and all Agreements.

IT IS FURTHER ORDERED that if a consumer asks a representative of defendants whether a particular product made a profit, made money, was a commercial success, or any similar question, defendants shall answer the consumer using the same guidelines immediately above. Although defendants may refuse to reveal the specific amount of money made by the product, defendants shall not refuse to reveal whether or not the product resulted in a net profit to the consumer.

### B. *Network of or Relationship with Corporations*

IT IS FURTHER ORDERED that defendants shall provide consumers with information, in writing, regarding any corporation being "targeted", "matched", or contacted regarding a consumer's idea. This information shall include the number of submissions made to the corporation over the last five years, and the number of licenses entered into with the corporation over the last five years. Although defendants may refuse to reveal the name of the corporation or corporate contact, they shall not refuse to provide the above information.

### C. *Necessity of Services*

IT IS FURTHER ORDERED that defendants shall, before a consumer agrees to purchase a Pre–Inventegration Services Agreement, or other similar agreement under which a portfolio containing market and design research is produced, provide consumers with a statement, in writing, and on a separate piece of paper in substantially the following form:

Defendants view market and design research to be integral to their Inventegration process. It is defendants' opinion that such research is necessary before proceeding to the step of attempting to obtain a license for a product with a corporation. It is defendants' policy to require that such research be performed prior to moving forward toward licensing. Should the consumer not wish to purchase the research services, he may still be able to secure a license, either on his own or with the assistance of another party, but defendants will refuse to work with that consumer.

IT IS FURTHER ORDERED that defendants shall, before a consumer agrees to purchase a Production Sample Presentation Agreement, or other similar agreement under which a virtual reality or prototype is created, provide consumers with a statement, in writing, and on a separate piece of paper in substantially the following form:

Defendants view the production of a virtual reality model and/or prototype to be integral to their Inventegration process. It is defendants' opinion that these models are necessary before proceeding to the step of attempting to obtain a license for a product with a corporation. It is defendants' policy to require that such models be created prior to submitting a new product idea to a corporation. Defendants do not represent that it is any particular corporation's policy to require that such models be created before a new idea will be considered. Should the consumer not wish to purchase these services, he may still be able to secure a license, either on his own or with the assistance of another party, but defendants will refuse to work with that consumer.

### D. *Patentability and Marketability Analysis*

IT IS FURTHER ORDERED that preceding any section in a Pre–Inventegration Report, or other similar report, that includes copies of, or refers to specific patents, defendants shall state, in all capital letters, the following: WE ARE NOT PROVIDING YOU WITH AN OPINION OF PATENTABILITY. SUCH AN OPINION MAY BE REQUIRED IN THE FUTURE. THIS INFORMATION IS PROVIDED ONLY TO ASSIST IN THE DESIGN PROCESS.

IT IS FURTHER ORDERED that preceding any section in a Pre–Inventegration Report, or other similar research report, that includes copies of, or refers to research regarding similar, competing, or conflicting products, defendants shall state, in all capital letters, the following: WE ARE NOT PROVIDING YOU WITH AN OBJECTIVE OR EXPERT OPINION OF MARKETABILITY OR OF THE POTENTIAL COMMERCIAL SUCCESS OF OR POTENTIAL MARKET FOR A PARTICULAR PRODUCT. THIS INFORMATION IS PROVIDED ONLY TO ASSIST IN THE DESIGN PROCESS.

### IV. *CONSUMER REDRESS*

IT IS FURTHER ORDERED that defendants shall transfer to the Federal Trade Commission ("Commission") the funds required under the final judgment no later than sixty (60) days after the date of entry of this Order by the Court.

In the event of any default on any obligation to make payment under this part, interest computed pursuant to 28 U.S.C. § 1961(a) shall accrue from the date of default to the date of payment.

The funds paid pursuant to this section shall be paid into a redress fund administered by the Commission and approved by

the court. Such redress is intended to be compensatory in nature, and no portion of such payment shall be deemed a payment of any fine, penalty, or punitive assessment. If redress to purchasers is wholly or partially impracticable, any remaining funds shall be paid to the United States Treasury.

## V. *MONITORING*

IT IS FURTHER ORDERED that in order to facilitate the redress fund and the Commission's monitoring of compliance with the provisions of this Order, the defendants shall, for a period of five (5) years after the date of entry of this Order:

(1) Notify the Commission in writing, within thirty (30) days after service of this Order, of the current residence address and employment status of each individual defendant, including the name and business address of their current employers;

(2) Notify the Commission in writing, within thirty (30) days of any change in such address, providing any such new contact information;

(3) Notify the Commission in writing, within thirty (30) days of any change in employment status, providing the details of any new position;

(4) Notify the Commission in writing, within thirty (30) days prior to the effective date of any proposed change in the structure of any business entity owned or controlled by any defendant;

(5) Upon seven days notice from the Commission, permit duly authorized representatives of the Commission access during normal business hours to the offices of any company under any defendant's control, to inspect or copy any documents belonging to any defendant or any company controlled or owned by any defendant that are relevant to any conduct subject to this Order;

(6) Refrain from interfering with duly authorized representatives of the Commission who wish to interview any of defendants' employers, agents, or employees (who may have counsel present) relating in any way to any conduct subject to this Order;

(7) Upon thirty (30) days written notice by a duly authorized representative of the Commission, submit written reports (under oath, if requested) and produce documents with respect to any conduct subject to this Order;

(8) appear on fifteen (15) days notice for deposition with respect to any conduct subject to this Order;

(9) within ten (10) days of the entry of this Order, provide to all current employees, and within ten (10) days of their first day of employment deliver to all future employees, a copy of this Order, and secure from each such employee a signed, dated statement, in writing, acknowledging receipt of such copy, which statement shall be maintained for a period of five (5) years and made available to the Commission for inspection and copying, upon written request.

Provided further that the Commission may otherwise monitor defendants' compliance with this Order by investigators posing as consumers, potential inventors, suppliers, and other entities, to the same extent to which such means would be lawful were the Commission or the Commission's attorneys not aware of any representation of such defendants by counsel.

## VI. *MAINTENANCE OF RECORDS*

IT IS FURTHER ORDERED that defendants shall, for five (5) years after the date of this Order, maintain and upon request make available to the Commission for inspection and copying:

(1) All advertisements, promotional materials, sales scripts, operations manuals, and client communications;

(2) All materials that were relied upon in creating the above materials;

(3) All materials that contradict, qualify, or call into question the above materials, including complaints or other communications with customers or with governmental or consumer protection organizations;

(4) All materials relied upon to create the Affirmative Disclosure Statement;

(5) Copies of consumers' signed acknowledgments of the Affirmative Disclosure Statement; and

(6) Copies of employees' signed copies of this Order.

## VII. *REPORT*

IT IS FURTHER ORDERED that within sixty (60) days after the date of entry of this Order, defendants shall file a report with the Commission setting forth the manner in which they have complied with this Order

## VIII. *COSTS AND ATTORNEYS' FEES*

IT IS FURTHER ORDERED that each party to this Order shall bear its own costs and attorneys' fees incurred in connection with this action; provided however, that in the event the Commission initiates proceedings to enforce the provisions of this Order and the Court determines that any defendant has violated any term of this Order, defendants shall jointly pay reasonable costs and attorneys fees incurred by the Commission in connection with the proceedings to enforce the Order.

## IX. *JURISDICTION*

IT IS FURTHER ORDERED that jurisdiction is retained by this Court for the purpose of enabling the parties to apply at any time for further orders and directions

as may be necessary or appropriate for the interpretation or modification of this Order, for the enforcement or compliance thereof, or for the punishment of violations thereof. The Clerk of Court shall mark the instant case administratively closed.